PR#128530     JORDAN, MARQCHELLO     3/5/2018

1

```
         IN THE UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF ARKANSAS
                 TEXARKANA DIVISION

MARQCHELLO JORDAN,

        Plaintiff,

vs.                  No. 4:17-CV-04011-SOH

CENTRAL TRANSPORT, LLC; ELMER ENRIQUE VENTURA; and JOHN
DOE 1, JOHN DOE 2 and JOHN DOE 3,

        Defendants.



         VIDEO DEPOSITION OF MARQCHELLO JORDAN
           TAKEN ON BEHALF OF THE DEFENDANTS
        ON MARCH 5, 2018, BEGINNING AT 10:06 A.M.
                  IN ROGERS, ARKANSAS
             REPORTED BY KERRI PIANALTO, CCR

                       APPEARANCES:

On behalf of the PLAINTIFF

        Ryan Scott
        BAILEY & OLIVER
        3606 W. Southern Hills Boulevard, Suite 200
        Rogers, Arkansas 72758
        479-202-5200
        rscott@baileyoliverlawfirm.com


On behalf of the DEFENDANT CENTRAL TRANSPORT, LLC

        Michael A. Thompson
        WRIGHT, LINDSEY & JENNINGS LLP
        200 West Capitol Avenue, Suite 2300
        Little Rock, Arkansas 72201
        501-371-0808
        mthompson@wlj.com
```

**EXHIBIT A**

**Page 2**

```
 1   On behalf of the DEFENDANT ELMER ENRIQUE VENTURA
 2      Phillip M. Brick
        Friday Eldredge & Clark
 3      400 West Capitol Avenue, Suite 2000
        Little Rock, Arkansas 72201
 4      501-376-2011
        pbrick@fridayfirm.com
 5
 6   Videographer:  Garrett Smelley
```

**Page 3**

```
                         INDEX
                                              Page
     Direct Examination by Mr. Thompson          4
     Cross Examination by Mr. Brick            196
     Redirect Examination by Mr. Thompson      217
     Recross Examination by Mr. Scott          221

                       EXHIBITS
     Number   Description                      Page
       1      W-2s and 1099s                    44
       2      Movement Display                  54
       3      Owner-Operator Settlements        56
       4      Driver/Passenger Witness Statement 136?
       5      Photographs                      145
       6      Photographs                      152
       7      Photographs                      157

                     STIPULATIONS
         It is stipulated that the deposition of
     MARQCHELLO JORDAN may be taken pursuant to agreement and
     in accordance with the Federal Rules of Civil Procedure on
     March 5, 2018, before Kerri Pianalto, CCR.
```

**Page 4**

 1   THE VIDEOGRAPHER:  My name is Garrett Smelley.
 2   The date is March 5, 2018, the time is 10:06.  This
 3   deposition is taking place at the Bailey & Oliver Law Firm
 4   in Rogers, Arkansas.  This is case number
 5   4:17-CV-04011-SOH in the United States District Court,
 6   Western District of Arkansas, Texarkana Division in the
 7   matter of Marqchello Jordan versus Central Transport, LLC,
 8   et al. The deponent is Marqchello Jordan.  Our court
 9   reporter is Kerri Pianalto.
10       If counsel will introduce themselves, the
11   witness will then be sworn.
12       MR. SCOTT:  Ryan Scott for the plaintiff.
13       MR. THOMPSON:  Michael Thompson, Wright, Lindsey
14   & Jennings, LLP, here on behalf of Defendant Central
15   Transport, LLC.
16       MR. BRICK:  And Phillip Brick here on behalf of
17   Defendant Elmer Ventura.
18   WHEREUPON,
19       MARQCHELLO JORDAN,
20   after having been first duly sworn, deposes and says in
21   reply to the questions propounded as follows, to-wit:
22       DIRECT EXAMINATION
23   BY MR. THOMPSON:
24   Q   Good morning, Mr. Jordan.  Can I get you to
25   start by just stating your full name for the record?

**Page 5**

 1   A   Marqchello Jordan.
 2   Q   Yes, sir.  Have you ever been deposed before,
 3   Mr. Jordan?
 4   A   Have I been what?
 5   Q   Deposed before?
 6   A   What does that mean?
 7   Q   All right.  Well, right now you and I are
 8   sitting and taking a deposition.  We've got a court
 9   reporter here who's taking down everything we say.  I'm an
10   attorney for a party you brought a lawsuit against.  I'm
11   asking you questions and you're answering my questions and
12   you've been sworn to tell the truth, the whole truth and
13   nothing but the truth.
14   A   Uh-huh.
15   Q   Have you ever sat for another deposition like
16   this before?
17   A   No, sir.
18   Q   Okay.  Well, there's a few just ground rules to
19   go over.  Most of these are just to make sure we get a
20   clean transcript --
21   A   Uh-huh.
22   Q   -- because it's important when we get to the
23   jury that you and I can at least agree on whatever the
24   transcript says, that's what was said here today.
25   A   Okay.

**Page 34**

1  that correct?
2    A  Yes.
3    Q  All right.  Were you an owner-operator the whole
4  time you worked for Swift?
5    A  No.
6    Q  Okay.  When did you make the switch from being
7  what I call a company driver to being an owner-operator?
8    A  Well, I take that back, mainly I was considered
9  an owner-operator, but I worked for an owner-operator, so
10  I was considered an owner-operator.
11    Q  Okay.  That makes sense.  Who were you working
12  for?
13    A  Swift.  It would be mainly Swift, but it was a
14  Swift driver, you know, somebody hired by Swift.  He was
15  an owner-operator so he's allowed to hire me, but still
16  under Swift.
17    Q  Yes, sir, and I'm asking who was that person
18  that hired you?
19    A  Casey.
20    Q  Casey what?
21    A  I don't know his last name.
22    Q  All right.  How did you -- how long did you work
23  for Casey?
24    A  I don't -- I don't remember.
25    Q  Okay.  Well, at the time of this accident, were

**Page 35**

1  you working for Casey?
2    A  No.
3    Q  Okay.  So in your time you were working for
4  Swift, were you either an owner-operator on your own or
5  working for Casey?
6    A  I was an owner-operator on my own.
7    Q  For most of the time?
8    A  From when the accident happened, I was an
9  owner-operator.
10    Q  Yes, sir.  And I'm just trying to figure out if
11  you had any other relationship to Swift in the whole
12  period of time you worked for them other than
13  owner-operator on your own and working for Casey?
14    A  I worked for another person too.
15    Q  Okay.  Who did you --
16    A  I don't even remember his name.
17    Q  You don't remember first or last of him?
18    A  No, I don't remember his name.
19    Q  Okay.  Anybody else you worked for?
20    A  Huh-uh.
21    Q  Okay.  Do you recall ever being directly an
22  employee of Swift?
23    A  I was an employee.  I mean --
24    Q  Sure.
25    A  When I was a student, I was employed.

**Page 36**

1    Q  When you were -- okay.
2    A  Yeah.
3    Q  After you were a student, though, you were
4  either working for Casey or this other driver?
5    A  Yeah.
6    Q  Or you were an owner-operator on your own?
7    A  Yes.
8    Q  Okay.  Now, when you're an owner-operator, that
9  means you own your own business, correct?
10    A  Yes, sir.
11    Q  Okay.  Did you own your truck when you were an
12  owner-operator out on your own?
13    A  I didn't own it, but I was gonna own it.
14    Q  Sure.  I want to be clear.  Had you purchased a
15  truck by financing?
16    A  Yes.
17    Q  Okay.  Who was financing the purchase of your
18  truck?
19    A  It was Rapid Response with Swift, I think.  I
20  think, I don't know.
21    Q  Okay.
22    A  But I was on a lease purchase contract.
23    Q  How does a lease purchase contract work?
24    A  It works you just pay every week.  You pay --
25  you pay a truck note every week and hopefully you can, you

**Page 37**

1  know, keep paying and get it paid off so you can own it.
2    Q  All right.  Had you incorporated your trucking
3  business or formed any kind of business entity for your
4  trucking business?
5    A  I don't understand.
6    Q  Sure.  Had you gone to the state and set up like
7  a corporation or an LLC or anything like that for your
8  owner-operator work?
9    A  No, sir, I was under Swift.
10    Q  Right.  Okay.  And so they were just paying
11  Marqchello Jordan --
12    A  Yes.
13    Q  -- correct?
14       Not Marqchello Jordan Trucking, Inc.?
15    A  No, sir.
16    Q  Okay.  How were you paid -- when you were an
17  owner-operator on your own, how were you paid?
18    A  How was I paid?
19    Q  Yes, sir.
20    A  By the load.
21    Q  You get a percentage of your load?
22    A  Well, I was paid by the mile.
23    Q  Paid by the mile, okay.
24    A  Yeah.
25    Q  Do you recall what you got paid by the mile?

Page 46

1   MR. SCOTT: Object to the form.
2   A   Yes.
3   Q   (BY MR. THOMPSON) Okay.
4   A   That's when I first hired as a student.
5   Q   So this is when you were working as a student
6   driver, correct?
7   A   Yes.
8   Q   Okay. And this shows, you can look in box
9   number one which for some reason up on the upper
10  right-hand corner is between box number seven and box
11  number two. You see box number one there?
12  A   Are you talking about right here?
13  Q   Yes, sir. The top row, upper right-hand corner.
14  A   Okay.
15  Q   You see box seven, box one, box two?
16  A   Yes.
17  Q   Okay. Leave it to the federal government to put
18  box seven before box number one.
19  A   Yes.
20  Q   Box number one is listed as wages, tips and
21  other compensation, correct?
22  A   Yes.
23  Q   And it shows that you had -- in 2013 from Swift
24  Transportation Services, you had wages, tips and other
25  compensation of $3,021.71, correct?

Page 47

1   A   Yes.
2   Q   Okay. Now, when you're -- we talked about all
3   the expenses you incur operating a tractor-trailer as an
4   owner-operator, correct, a minute ago?
5   A   Yes.
6   Q   All right. When you're working as an employee
7   for Swift, you don't pay any of those expenses, right?
8   A   What expenses?
9   Q   All the expenses we talked about, the fuel, the
10  tires, the maintenance. When you were a student driver
11  for Swift, you weren't paying those for operating --
12  A   No.
13  Q   Okay. All right. Let's turn to the 2014 W-2.
14  Now, again, this 2014 W-2 shows, again, your employer's
15  name is Swift Transportation Services, correct?
16  A   Yes.
17  Q   All right. And if we look in that same box,
18  number one, it says $69, correct?
19  A   Yes.
20  Q   Okay. We're going to -- you have another tax
21  form from 2014 that I think has the vast majority of your
22  income, but any idea what this $69 is from?
23  A   No, sir.
24  Q   Okay. All right. So that's all we need to ask
25  about that page. Let's turn to the next page -- the next

Page 48

1   document which is a 1099 from 2014. All right. And here,
2   if you look in the upper left-hand corner, it says the
3   payer's name is something called Owner-Operator Reporting
4   Group, correct?
5   A   Yes.
6   Q   All right. So this 1099 here represents the
7   income you received as an owner-operator, correct?
8   A   Yes.
9   Q   Okay. And if we look in box seven on here,
10  nonemployee compensation, do you see that box?
11  A   Yes.
12  Q   And it shows nonemployee compensation of
13  $102,152.23, correct?
14  A   Yes.
15  Q   Do you know, is that a gross figure or a net
16  figure?
17  A   I don't know.
18  Q   All right. Do you know if that 102,152, do you
19  know if that has already had all the expenses we talked
20  about taken out of?
21  A   No.
22  Q   You don't know?
23  A   No, I don't.
24  Q   Okay. All right. Well, do you have any idea
25  what your net business income was in 2014?

Page 49

1   A   What does that mean?
2   Q   It means --
3   A   Like how much I made?
4   Q   How much you made after you paid all the
5   expenses you had to pay on.
6   A   I don't know.
7   Q   You don't know. Okay.
8   A   I don't know.
9   Q   Do you have any document we could look at to see
10  what your net business income was for 2014?
11  A   This is it right here.
12  Q   Well, you told me you don't know if that's net
13  or gross. Gross would be before you paid all your
14  expenses, net would be after you paid all your expenses.
15  A   Well, they take it all out, so I'm guessing that
16  this is -- that's what they paid me. That's what they
17  gave me cash, I guess.
18  Q   Okay. You're guessing right now?
19  A   Yeah, because they take it out. They take --
20  all my checks, they take everything out. Whatever I owe
21  them, they take it out and they pay me, so this is what
22  they pay me.
23  Q   We're going to talk about one of those
24  settlement sheets in a minute, but do you actually know if
25  that number is before or after they take all those amounts

13 (Pages 46 to 49)

**Page 50**

1  out?
2  A  No, I don't.  I don't know.
3  Q  Okay.  Did you file taxes in 2014, or for 2014?
4  A  No.
5  Q  Okay.  And you don't have -- would you agree
6  with me if you had filed your taxes, that would be one
7  place where we could look to see what your net business
8  income was for 2014?
9  A  I don't --
10     MR. SCOTT:  Object to the form.  Go ahead and
11 answer.
12 A  I don't know.
13 Q  (BY MR. THOMPSON)  You don't know?
14 A  No.
15 Q  Okay.  Well, I mean, you do know that when you
16 file a tax return you tell the federal government this is
17 how much money I made, right?
18 A  Okay.
19 Q  Do you agree with me on that?
20 A  I will have to turn this in, won't I?  I'd have
21 to give them this so they'll see how much I made.
22 Q  Right.  But then as a business owner, you can
23 subtract out all the expenses you incurred in operating
24 your business.
25 A  Yes.

**Page 51**

1  Q  You understand that, sir?
2  A  Like food and my receipts and stuff?
3  Q  Yes, sir.
4  A  I understand, yes.
5  Q  Because the government taxes you on the net, the
6  government doesn't tax you on the gross; you understand
7  that --
8  A  Yes.
9  Q  -- sir?
10 A  Yes.
11 Q  Okay.
12 A  So whatever I had to spend for my business, I
13 would be able to deduct that?  Whatever I had to spend,
14 the money that I spent out of this?
15 Q  Right.  So do you agree with me then that if you
16 had filed your taxes, we would have a document we could
17 look at and say, this is what his net business income was
18 in 2014?
19 A  Yes.
20 Q  Okay.  But we don't have that document, do we?
21 A  Huh-uh.
22 Q  Okay.  All right.  Let's turn to the next page.
23 And just for the record, I just noticed that in the
24 world's tiniest font in the lower right-hand corner
25 they're actually Bates numbered, which is a page number so

**Page 52**

1  we can all know we're talking about the same document.
2  A  Uh-huh.
3  Q  And this one, if you see down there in the lower
4  right-hand corner, is JORD6?
5  A  Yes.
6  Q  Do you see that, sir?
7  A  Yes.
8  Q  All right.  And this is your 2015 1099, correct?
9  A  Yes.
10 Q  Okay.  And again I see in the upper left-hand
11 corner, I see O/O Swift Transportation, correct?
12 A  Yes.
13 Q  O/O, that's an abbreviation for owner-operator,
14 isn't it?
15 A  Yes, sir.
16 Q  All right.  And then if I go to that same box,
17 seven, I see nonemployee compensation of 79,151.85,
18 correct?
19 A  Yes.
20 Q  Okay.  Again, is it true just like with that
21 2014 1099, that you don't know whether or not that's a net
22 or a gross figure?
23 A  No, I don't.  I don't even think that was the --
24 what was the other one, 2014?  I didn't even think that
25 was a full year that I worked.

**Page 53**

1  Q  Right.  My question is that 79,000 we see on the
2  2015 form, you don't know if that's a net or a gross
3  figure, correct?
4  A  Yes.
5  Q  Okay.  Do you have any idea what your net
6  business income was in 2015?
7  A  Net?
8  Q  Your net business income?
9  A  No.
10 Q  Okay.  Did you file taxes for tax year 2015?
11 A  No.
12 Q  Okay.  Would you agree with me just like you
13 agreed with me for 2014 that if you had -- if you had
14 filed taxes for 2015, that would show what your net
15 business income was for 2015?
16 A  Yeah, I guess.  I mean, I don't know.
17 Q  Okay.  But as is, we don't have any documents we
18 can look at to say this was your net business income in
19 2015, do we?
20 A  I don't -- I don't understand like taxes and
21 everything.  I don't do taxes.
22 Q  Okay.  I want to make sure we're on the same
23 page here.
24 A  Yes.
25 Q  Remember, gross is what you receive for doing

**Page 54**

    your work as an owner-operator before you pay any
    expenses, okay?
    A   Okay.
    Q   That's gross. Net is what you have left over
    from working as an owner-operator after you've paid all
    the expenses we talked about that you incur driving that
    truck.
    A   Oh, right.
    Q   Okay. Do you have anything that can tell me
    what the net business income was in 2015?
    A   No net. I don't know no net.
    Q   You don't know the net. Okay. Okay. And you
    can set that document aside.
    A   What does --
    Q   Just set it -- just set it to the side. I'm
    going to hand you another one.
    A   All right.
    Q   I'm marking -- I'm handing you what I'm marking
    as Exhibit 2 to your deposition.
        (WHEREUPON, Exhibit 2 was marked for
    identification.)
        THE WITNESS: Can I take a break, please?
        MR. SCOTT: Yeah.
        MR. THOMPSON: Absolutely.
        MR. SCOTT: I was going to ask the same thing.

**Page 55**

    We've been going about an hour and I think we've all had
    our coffee.
        MR. THOMPSON: Perfect.
        THE VIDEOGRAPHER: The time is 11:03. We're now
    off the record.
        (Short break from 11:03 a.m. to 11:15 a.m.)
        THE VIDEOGRAPHER: The time is 11:15. We're now
    on the record.
    Q   (BY MR. THOMPSON) All right. Mr. Jordan,
    before we took a break I had handed you what I've marked
    as Exhibit 2.
    A   Yes.
    Q   Can you tell me what Exhibit 2 is?
    A   Movement display.
    Q   Sure. Is this a document you're familiar with
    seeing before?
    A   No, sir, I've never seen this document before.
    Q   Okay. Well, I won't have many questions for you
    then. And I can see up on the center column it's labeled
    Swift Transportation?
    A   Yes, sir.
    Q   And I can see in the lower right-hand corner
    we've got those tiny little Bates numbers. You can see
    JORD number 13 on the first page of it, correct?
    A   Yes.

**Page 56**

    Q   All right. So I'll represent to you you
    produced this to us in this case, but that doesn't mean
    it's necessarily a document you know.
    A   Huh-uh.
    Q   Okay. Well, then I'm going to move on if this
    isn't a document you're familiar with. All right. I'm
    going to hand what I marked as Exhibit 3 to your
    deposition. And this up at the top says Swift
    Transportation, owner-operator settlements, correct?
        (WHEREUPON, Exhibit 3 was marked for
    identification.)
    A   Yes.
    Q   And settlement date is April 30th of 2015,
    correct?
    A   Yes.
    Q   All right. And if you look in that lower
    right-hand corner, I can see the Bates number is JORD18,
    correct?
    A   Yes.
    Q   All right. Now, I will tell you that you have
    produced more than I've made -- more of these than what
    I've made as Exhibit 3. I just pulled the first -- the
    top of the stack at random, okay?
    A   Okay.
    Q   Is this a document you're familiar with looking

**Page 57**

    at?
    A   Yes.
    Q   Okay. And I just want to talk to you about the
    first page of it to start out with. All right. Again, we
    noted that settlement date as April 30, 2015. Is this
    something you get weekly?
    A   Yes.
    Q   Okay. And this shows, and I'm just going from
    the top, this shows that you drove 4,186 miles loaded in
    the week that corresponds to April 30th of 2015, correct?
    A   Yes.
    Q   Okay. And you drove 351 miles empty in that
    week, correct?
    A   Yes.
    Q   Okay. Do you have a different pay rate for
    traveling loaded versus unloaded?
    A   Yes.
    Q   Okay. What's your pay rate for your travel --
    your mileage when you're loaded?
    A   When I'm loaded, I think it's maybe a 20-cent
    difference.
    Q   Okay. So you gave me a 1.35 to 1.40 --
    A   Uh-huh.
    Q   -- per mile rate earlier. Is that your loaded
    rate?

```
 1  was hit is how I felt after the accident.
 2      Q   Okay.  And to be clear, you didn't have any
 3  other nervous disorder or marked mental confusion before
 4  this wreck, right?
 5      A   No, sir.
 6      Q   And you didn't have any nervous disorder or
 7  mental confusion that was a cause of this wreck, right?
 8      A   No, sir.
 9          MR. SCOTT:  That's all.
10          MR. THOMPSON:  Mr. Jordan, appreciate your time.
11          THE WITNESS:  Yes, sir.
12          MR. THOMPSON:  Have a safe flight back.
13          THE WITNESS:  Thank you, sir.
14          THE VIDEOGRAPHER:  This concludes the video
15  deposition of Marqchello Jordan.  The time is 3:48.  We're
16  now off the record.
17          (DEPOSITION CONCLUDED AT 3:48 P.M.)
18
19
20
21
22
23
24
25
                       222
```

```
 1            C E R T I F I C A T E
 2  STATE OF ARKANSAS   )
 3                     ) SS:
 4  COUNTY OF WASHINGTON)
 5       I, Kerri Pianalto, Certified Court Reporter
 6  within and for the State of Arkansas, do hereby certify
 7  that the above-named MARQCHELLO JORDAN was by me first
 8  duly sworn to testify the truth, the whole truth, and
 9  nothing but the truth, in the case aforesaid; that the
10  above and foregoing deposition was by me taken and
11  transcribed pursuant to agreement, and under the
12  stipulations hereinbefore set out; and that I am not an
13  attorney for nor relative of any of said parties or
14  otherwise interested in the event of said action.
15       IN WITNESS WHEREOF, I have hereunto set my hand
16  and official seal this 12th day of March, 2018.
17
18
19
20
21
22
23
24          KERRI PIANALTO, CCR
25          State of Arkansas, No. 651
                       223
```