# Transcript of the Testimony of

# Ralph Scott, JR., Ph.D.

**Date:** December 20, 2018

**Case:** Marqchello Jordan v. Central Transport, LLC, et al

**Bushman Court Reporting**
Kristi Gray
Phone:  (501) 372-5115
Fax: (501) 378-0077
<www.bushmanreporting.com>

**EXHIBIT B**

Page 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

MARQCHELLO JORDAN                    PLAINTIFF

VS.    NO. 4:17-CV-4011-SOH

CENTRAL TRANSPORT, LLC,
ELMER ENRIQUE VENTURA,
and JOHN DOE I, JOHN DOE 2,
AND JOHN DOE 3                       DEFENDANTS

_____

VIDEOTAPED ORAL DEPOSITION
OF
RALPH D. SCOTT, JR., Ph.D.
(Taken December 20, 2018, at 2:20 p.m.)

_____

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
GEOFF D. HAMBY, ESQUIRE
BAILEY & OLIVER LAW FIRM
3606 SOUTHERN HILLS BOULEVARD
ROGERS, ARKANSAS  72758
479-202-5200

ON BEHALF OF DEFENDANT ELMER VENTURA:
PHILIP M. BRICK, ESQUIRE
FRIDAY, ELDREDGE & CLARK, LLP
400 WEST CAPITOL AVENUE, SUITE 2000
LITTLE ROCK, ARKANSAS  72201
501-376-2011

ON BEHALF OF DEFENDANT CENTRAL TRANSPORT:
QUINTEN J. WHITESIDE, ESQUIRE
WRIGHT, LINDSEY & JENNINGS, LLP
200 WEST CAPITOL AVENUE, SUITE 2300
LITTLE ROCK, ARKANSAS  72201
501-212-1319

ALSO PRESENT:  RICHARD HAYDEN, VIDEOGRAPHER

Page 3

INDEX

STYLE AND NUMBER                                 1
APPEARANCES                                      2
CAPTION                                          4
WITNESS:  RALPH D. SCOTT, JR., Ph.D.
    Examination by Mr. Brick                     6
    Examination by Mr. Hamby                    39
    Further Examination by Mr. Brick            42
    Deposition Concluded                        44
COURT REPORTER'S CERTIFICATE                    45

EXHIBITS

NUMBER:                            MARKED
EXHIBIT 1 - Expert Report                        7
EXHIBIT 2 - Updated Report                       7
EXHIBIT 3 - Expert witness file                  9
EXHIBIT 4 - Table 4                             38
EXHIBIT 5 - Economic loss                       41
EXHIBIT 6 - Economic loss                       41
EXHIBIT 7 - Invoice                             43

Page 4

CAPTION

ANSWERS AND VIDEOTAPED ORAL DEPOSITION OF RALPH D. SCOTT, JR., Ph.D., a witness produced at the request of the Defendants, taken in the above-styled and numbered cause on the 20th day of December, 2018, before Kristina R. Gray, Arkansas Supreme Court Certified Court Reporter #725, at 2:20 p.m., at Hendrix College, Mills Building, Room 308, Conway, Arkansas, pursuant to the agreement hereinafter set forth.

* * * * * * * * * *

STIPULATIONS

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the videotaped oral deposition of RALPH D. SCOTT, JR., Ph.D., may be taken for any and all purposes according to the Federal Rules of Civil Procedure.

Page 5

1             P R O C E E D I N G S
2        THE VIDEOGRAPHER: I am Richard Hayden
3 with Arkansas Realtime Reporting. I'll be
4 the videographer this afternoon. The date is
5 December the 20th, 2018. The time is 2:20
6 p.m. This deposition is taking place at the
7 offices of Ralph Scott at Hendrix College in
8 Conway, Arkansas. This is Case No.
9 4:17-CV-4011-S08 in the United States
10 District Court for the Western District of
11 Arkansas, Texarkana Division, entitled
12 Marqchello Jordan versus Central Transport,
13 LLC, et al. The deponent is Ralph Scott.
14 Our court reporter is Kristi Gray. If
15 counsel will introduce themselves and the
16 witness will be sworn.
17        MR. BRICK: My name is Philip Brick.
18 I'm here on behalf of Defendant Elmer
19 Ventura.
20        MR. WHITESIDE: My name's Quinten
21 Whiteside. I'm here on behalf of Defendant
22 Central Transport, LLC.
23        MR. HAMBY: Geoff Hamby here for the
24 plaintiff.
25        WHEREUPON,

Page 6

1       RALPH D. SCOTT, JR., Ph.D.,
2      Having been first duly sworn, was
3     examined and testified as follows:
4           EXAMINATION
5 BY MR. BRICK:
6 Q  Dr. Scott, good afternoon. I introduced myself
7 before the deposition was getting started today, and
8 we've met before. But, again, my name is Phil Brick,
9 and I represent Mr. Ventura in this action. If you
10 could just state your full name.
11 A  **Ralph D. Scott, Junior.**
12 Q  And what's the name of your company?
13 A  **Economic and Financial Consulting Group, Inc.**
14 Q  I want to talk about the file that you have here
15 today, and there's just a few items in here, so. The
16 first thing is a report that I understand that you
17 originally prepared in this case dated October 9, 2017.
18 A  **That's correct.**
19 Q  And you have a copy of that report in front of
20 you?
21 A  **I do.**
22 Q  I've got a copy here that's been Bates numbered as
23 part of plaintiff's production, and it's got a report,
24 a three-page report, plus two tables and then five
25 exhibits.

Page 7

1 A  **Yeah. I actually considered the tables to be part**
2 **of the report, but it's three pages of narrative, two**
3 **pages of tables, and then exhibits.**
4 Q  Okay. And you've got five exhibits from what you
5 recall in your original report?
6 A  **Yes.**
7 Q  I'm going to mark your original report as Exhibit
8 1 to your deposition.
9       (WHEREUPON, a document was marked for
10     identification as Exhibit No. 1.)
11 A  **Okay.**
12 Q  And then we've got a supplemental report that was
13 provided to us a couple days go that I understand that
14 you prepared and it supplements some of your opinions
15 and the tables, and then there's a couple of pages of
16 deposition that you've attached as an exhibit to that
17 report?
18 A  **That's correct.**
19 Q  And I'm going to mark that as Exhibit 2 to your
20 deposition.
21       (WHEREUPON, a document was marked for
22     identification as Exhibit No. 2.)
23 A  **Okay.**
24 Q  And you have a copy of that in front of you as
25 well?

Page 8

1 A  **I do.**
2 Q  Okay.
3       THE VIDEOGRAPHER: Dr. Scott, will you
4     put that microphone on that's right there?
5     Thank you.
6 BY MR. BRICK:
7 Q  I forgot to put mine on when we got started, too.
8     You've also got your file in front of you, and I
9 understand in addition to the two reports that we've
10 already marked, there's a handful of documents. Most
11 of it's correspondence and it looks like a 2017 income
12 statement from Mr. Jordan.
13 A  **It's a 1099 actually. It doesn't really have**
14 **anything to do with income. It has to do -- well, it**
15 **has something to do with income, but it's revenues. It**
16 **doesn't really capture income. It's really not very**
17 **useful to me.**
18 Q  Okay. So you've got this 2017 1099. Did you
19 actually use that in any of your opinions?
20 A  **No.**
21 Q  Okay. We're going to mark it -- and I understand
22 it's okay with you to send this to the court reporter.
23 She's going to mail it back to you. We're going to
24 mark the rest of the contents of your physical file
25 Exhibit 3 to your deposition.

Page 9

1      (WHEREUPON, a document was marked for
2       identification as Exhibit No. 3.)
3   A  Okay.
4   Q  Other than the documents that we've gone through,
5   the two reports and the physical documents that you
6   have in your file, have you received anything else in
7   your case?
8   A  I have.
9   Q  What other things have you received?
10  A  I would probably have to go sit at my computer. I
11  think it would be descriptive to say that I've got a
12  few W-2s and I've got some more 1099s, nothing that
13  really is pertinent to enable me to calculate lost
14  earning capacity.
15  Q  So you have -- you may have some other records of
16  what the plaintiff had earned probably prior to the
17  accident?
18  A  But I really don't have anything that would say
19  what he actually earned. I have information concerning
20  revenues generated, which would have to then be
21  adjusted for expenses to get down to what he actually
22  earned.
23  Q  You don't have any documentation to show what he
24  actually earned before the accident?
25  A  That's correct.

Page 10

1   Q  And those W-2s and 1099s that you have received
2   from Mr. Jordan from before the accident, did those
3   play any effect into the report that you prepared since
4   you had them?
5   A  They did only to extent that it convinced me that
6   I needed to look at statistical data for the average
7   earnings of truck drivers to arrive at a measure of
8   base income because I just didn't have what I needed in
9   the financial documents that I was provided.
10  Q  Okay. Other than helping you make the decision
11  that you should look at base income, any other way that
12  those W-2s and 1099s affected your opinions in this
13  case?
14  A  No, not at all.
15  Q  Have you received any depositions in this case?
16  A  No. You know what? I may have some depositions
17  actually.
18  Q  Do you know which depositions you've received?
19  A  I don't as I sit here. If we take a break at some
20  point, Mr. Hamby was good enough yesterday to send me a
21  list of everything they've sent me and I can just look
22  at that to see. I think I -- you know what, I think I
23  had Dr. B's deposition. Is it okay if I call him Dr.
24  B?
25  Q  Kabakibou?

Page 11

1   A  Oh, is it Dr. K?  Yes.
2   Q  Yes.
3   A  I have Dr. K's deposition.
4   Q  No, that's fine to call him Dr. B -- or Dr. K, if
5   you want to. I tell you what, let's do this. I'll
6   probably -- let me finish asking questions, and
7   I understand other counsel may have questions. Then
8   we'll take a quick break, and I may just have you check
9   and see what else you have if that's okay.
10  A  Sure.
11  Q  Is it fair to say that the two reports that we've
12  marked as Exhibit 1 and Exhibit 2 to your deposition
13  contain the opinions that you have in this case?
14  A  Yes.
15  Q  Do you have any intention of updating these
16  reports between now and the time of trial?
17  A  I don't, assuming that the trial goes on as
18  scheduled. Sometimes I'm asked to update my
19  computations if a trial gets bumped or continued and
20  then there needs to be a different breaking point
21  between past and future.
22  Q  That makes sense. So as long as the trial date
23  stays on as it is, then you don't have any intention of
24  updating your opinions?
25  A  That's correct.

Page 12

1   Q  Did you know when trial is scheduled in this
2   matter?
3   A  You know what, actually, I think I made all my
4   computations effective as of the date of my report
5   instead of the date of the trial. Again, I don't think
6   I'm going to change that. It's close enough to the
7   date of the trial. I think it's in March; is that
8   right?
9   Q  Yeah. I'm not trying to quiz you too much. You
10  understand that there's a trial in March of 2019 in
11  this case?
12  A  Yeah, yeah. Actually, my breaking point between
13  past and future is -- well, you know what? On my new
14  computations, I think I knew the trial date March 18th,
15  so all my new tables are based on that trial date. The
16  original tables associated with my October 9th report
17  were not.
18  Q  Okay. Dr. Scott, is it fair to say that about two
19  thirds of your income comes from providing consulting
20  in cases like this?
21  A  Well, yes. Cases like this and others. And most
22  of mine would be under the umbrella personal injury and
23  that would include med mal or wrongful death, et
24  cetera. But I think that's the way you guys use that
25  term, personal injury.

Page 25

1  Q   But if Mr. Jordan were to get an award and he were
2  to invest that in something that had a higher interest
3  rate, he could potentially earn more than what you have
4  for --
5  A   He could, but, again, the important thing to note
6  would be that he would be taking more risk if he did
7  that. Risk and return are positively related.
8  Q   You haven't done any financial advising for
9  Mr. Jordan, have you?
10 A   No.
11 Q   Do you consider yourself a financial advisor?
12 A   No. I go out of my way to try to not give
13 financial advice, although, again, since we've talked
14 about my macro class a couple of times, I do tell my
15 macro classes don't invest in long-term bonds right
16 now, which I think maybe you guys could all give that
17 same advice.
18 Q   Dr. Scott, let's jump over to your lost earning
19 capacity tables.
20 A   Sure.
21 Q   I understand you've got two different scenarios.
22 A   I do.
23 Q   Let's just start by talking about the base income
24 that you've come up with.
25 A   Okay.

Page 26

1  Q   It's fair to say that that base income is used for
2  both scenarios?
3  A   It is, yes, except for a very short period under
4  scenario one, the base income is dropped down to 12,000
5  per year, so it's my understanding that for some finite
6  period of time, Mr. Jordan was actually paying someone
7  $12,000 a year to help him out.
8  Q   Yes. We'll certainly get back to that. I
9  understand that you've made that assumption under both
10 scenarios?
11 A   Yes, for the past loss.
12 Q   For that period of time?
13 A   For the past loss, yes.
14 Q   How did you come up with the base income for
15 Mr. Jordan?
16 A   Average earnings of truck drivers.
17 Q   And if I remember correctly, the source of that
18 information is attached to your first report?
19 A   It is, yes.
20 Q   And that's a national average, though. It covers
21 people in Orlando -- in Atlanta like Mr. Jordan and
22 people in California, Texas?
23 A   It does. I've looked at that. I don't think
24 there's a lot of difference across states in long-haul
25 truck drivers because typically, you know, they're

Page 27

1  nationally-based and their routes take them out of
2  Arkansas or out of whatever state they might be located
3  in.
4  Q   Did you ever consider looking at Mr. Jordan's past
5  earnings or income to determine what his base income
6  rate should be?
7  A   I think it would be correct to say that I
8  considered that. I didn't have any -- as we've already
9  discussed, I didn't have any of that information.
10 Q   What information would you have needed to make
11 that calculation?
12 A   Well, I would have wanted to look at tax returns,
13 which I know he didn't file, and which may not have
14 been accurate anyway. I rarely look at a truck
15 driver's tax return where their -- what they show up is
16 reflective of what they're actually making. But yeah,
17 I would have liked to have seen tax returns.
18 Q   Do you think it's fair to say that if we were to
19 be able to look at Mr. Jordan's past earnings to come
20 up with an average of what he was actually earning in
21 the past that would be more accurate than the national
22 average?
23 A   I would not necessarily say that that would be
24 more accurate because, again, what I'm calculating is
25 his lost earning capacity, and I would not be able to

Page 28

1  look at that and know if he had worked on a full-time
2  basis or not or all of the other factors that were
3  going on. I don't want to give the impression I
4  wouldn't have liked to have seen that, but I don't know
5  that it would have necessarily been more accurate or
6  would have changed my opinion.
7      One other thing just to clarify on what I said
8  earlier, truck drivers legitimately have the ability
9  under the tax laws to write off a lot of expenses and
10 they're not really cheating on their tax returns when
11 they do that.
12 Q   Oh, okay. Yes. And I -- I didn't construe that
13 to mean that you thought that they would be doing
14 anything shady on their tax returns.
15 A   No, no, no. Okay. Good.
16 Q   But you certainly understand that a tax return
17 would show what expenses he may have had as opposed to
18 just a 1099 or W-2?
19 A   It would. But let me just give you an example. I
20 frequently will see truck drivers that are
21 self-employed that for whatever reason they're not
22 making the average earnings of truck drivers. And in
23 those instances, many times I go ahead and use the
24 average earnings of truck drivers as a measure of their
25 earning capacity as opposed to what they've actually

Ralph Scott, JR., Ph.D. 12/20/2018                      Marqchello Jordan v. Central Transport, LLC, et al

Page 45

```
 1              CERTIFICATE
 2    STATE OF ARKANSAS)
 3              )ss
 4    COUNTY OF PULASKI)
 5        I, Kristina R. Gray, Arkansas Certified Court
      Reporter #725, do hereby certify that the facts stated
 6    by me in the caption on the foregoing proceedings are
      true; and that the foregoing proceedings were reported
 7    verbatim through the use of the voice-writing method
      and thereafter transcribed by me or under my direct
 8    supervision to the best of my ability, taken at the
      time and place set out on the caption hereto.
 9         I FURTHER CERTIFY that in accordance with Rule
      30(e) of the Rules of Civil Procedure, review of the
10    transcript was not requested.
           I FURTHER CERTIFY that I am not a relative or
11    employee of any attorney or employed by the parties
      hereto, nor financially interested, or otherwise, in
12    the outcome of this action, and that I have no contract
      with the parties, attorneys, or persons with an
13    interest in the action that affects or has a
      substantial tendency to affect impartiality, that
14    requires me to relinquish control of an original
      deposition transcript or copies of the transcript
15    before it is certified and delivered to the custodial
      attorney, or that requires me to provide any service
16    not made available to all parties to the action.
17        WITNESS MY HAND AND SEAL this 3rd day of January,
      2019.
18
19    _____
      Kristina R. Gray
20    Arkansas State Supreme Court
      Certified Court Reporter #725
21
22
23
24
25
```

12 (Page 45)